Will the clerks please call the next, the first case? 424-1191-WC, Todd A. Fraley, Appellant by Gregory Tewitt v. Illinois Workers' Compensation Comm'n, et al., E.D., Nyer & Co., Appley, by Jeffrey Zucke. Mr. Tewitt, you may proceed. Thank you, Judge. I know there's been a lot of words written throughout this record, so I'm going to try to distill it down as best I can. And I think the main issue that we're raising here is, did the Commission properly and use the legal standard in evaluating the evidence between the two cases? And there are the two cases, the original injury in 2016, and then he had the 2016 injury, I think it was, later. But the point we are trying to make is that when you evaluate a 19-H case, you do it from two points in time. The first is the original arbitration decision, which was 3-17-16, by Arbitrator Abbaci. And then the second point of comparison is on February 7th, 2023, which is when we had the review hearing before Commissioner Dorries. We have to prove that between 2016 and 2023, there was an increase in disability of Mr. Fraley's left knee. And I think the evidence clearly shows that there was. Unfortunately, the Commission, well, first, if we go back to Arbitrator Abbaci's findings, because that's kind of the baseline that we're looking at. That's the first comparison point. And then the second comparison point is 2007-23. Arbitrator Abbaci had noted that he had been released to unrestricted work at the time, and that he was improving, but he still had complaints of swelling, a constant achy pain, and popping and clicking. And there had been an AMA rating done by Dr. Weiss in May of 2014, which showed an antalgic gait, some swelling and edema, atrophy of the right thigh, swelling of the left patella. So that's the baseline. Those were those findings that existed at the time of Arbitrator Abbaci's hearing. And he awarded 30% disability of the leg at that point in time. Now, the injury itself was very severe. He had had a ruptured patella tendon. He had had a fracture of the patella. He had medial and lateral meniscus tears. He ended up having hardware put into his knee. But Arbitrator Abbaci looked at the factors and felt he had 30% disability. In the hearings, as we move forward, the employer basically focused on medical records from 2017 that were related to the second surgery that was done on the left knee. Obviously, that was done after Arbitrator Abbaci's decision, because the surgery was done in 2017. Dr. Weiss had agreed that this surgery was necessary and related to that original injury. And I think the employer, when they were presenting their case, there was always, what happened in 2017? What did the physical therapist say? What did the doctor say? What did he tell his physical therapist? And we'll agree that when he was released from that second surgery and went through his therapy, he was feeling better. That's a normal thing. I've had three orthopedic surgeries, and I've gone through physical therapy, and I feel really good. But that was back in 2017. And that's not the point that you evaluate this case. The point you evaluate the case is, how was he doing in February 7, 2023, when he testified before Commissioner Dorries? And the commission also used the same approach of looking at what was going on in 2017 and how he was feeling in 2017. And unfortunately, I think they then missed the proper legal assessment. The last orthopedic visit was October 13, 2017, by Dr. Whitehurst. So that's the last time an orthopedic surgeon sees Mr. Fraley. The commission looked at the Weiss AMA rating that we've discussed above. But pages C11 through C15 of the decision of the commission on the 19H, all they do is talk about how he was feeling. How was he? What did he tell the doctors? How was his knee doing? What was he telling the physical therapist? How was it doing? Again, the only two objective findings discussed in the commission's decision were both in 2017. One is it's page C12, and it was Dr. Borchardt said his gait was normal and he had no effusion. That was on 11-29-17. On 12-20-17, pages 6 through 7, C12 and 13 of the record, Borchardt says revealed a normal gait, no effusion, 0 to 90 degree flexion. Although he must be using a different format than Dr. Weiss, because Weiss used 0 to 140 flexion. But the commission also focused on Fraley's statement that he was supposedly no better or no worse, and therefore had no increased disability. And that was at the time of the hearing. And that was during cross-examination. Here's what the question was. When you compare January of 13 to December of 17, again, we're not even talking about 2023, when the hearing is, but when comparing 2013 to December of 17, this was Mr. Zucke asking the question, if you compare how you were at those two different periods, you certainly were any worse. True. And the response was, I honestly say, I don't remember how I felt in 2013, compared to how I felt in 2017. That was five years ago. I don't remember that far back. And that was at page C106 of the record. And we've already cited in our brief, the international harvester versus industrial commission case where the employee specifically testified that his physical condition had not changed. And the respondent employer was arguing, well, if his condition hasn't changed, he can't have a 19H. The court stated the employer argues that the claimant's condition is within his personal knowledge, although claimant is in the best position to know how he or she feels doctors or medical experts are in the better position to know the actual physical condition of the claimant. Thus claimant's testimony as to his change in physical condition is not within his personal knowledge. And the court affirmed the 19H award of increased disability. So just because a statement of what the claimant says, that he's in the same position, that does not rule out the disability, increased disability, because we're looking at objective medical evidence is the key factor in determining whether there's increase of disability. You've staked that out. So now you've moved into, are the medical experts in agreement here in this case? Only orthopedic opinion other than Dr. Chudik is from October 13, 2017. That was Dr. Whitehurst when he was still treating. The employer apparently sent Mr. Fraley for an examination, but no report was ever prepared or delivered to me. So there is no opposing orthopedic opinions other than Dr. Chudik. And Chudik was in 2021. The last Whitehurst opinion, the treating doctor was on October 13, 2017. So it's our position that Dr. Chudik performed a very complete evaluation, reviewed all of the medical records, reviewed all of the actual imaging studies, and rendered an opinion that there was an increase. I think his words were an obvious increase in disability, that he's going to need a knee replacement because of the degeneration and because of the result of both injuries. So yes, I agree that medically there's clear proof of increased disability. The Chudik report was given a short shrift by the commission. They rejected it because, quote, it documented current restrictions that were not corroborated in the 2017 post-surgical recovery records from Athletico in Ortho, Illinois. That's true. I agree. In 2017, when he was released, he was doing, you know, feeling better. He went back to work. His work is very, very hard, but he continued to work at a very hard job, physically demanding on his feet, climbing, doing heavy lifting for another five years before he's seen Dr. Chudik. So Dr. Chudik has the most recent complete assessment of his condition. So Dr. Chudik, like I said, he did all the review. He said there was progression of scarring, fibrosis, quadriceps, tendinitis, tendinosis, moderate cartilage loss, and he said that the frailty had developed post-traumatic arthritis from the injuries, and he said he will need that further care that we've already talked about. So none of these findings existed at the time of arbitrator Herbace's trial. That's clear. So there's medical evidence of an increase of pathology in the need of treatment and disability as compared from Dr. I don't know why I keep calling him Dr. Arbitrator Herbace's decision in 2016 and the current condition in 2023. The commission also failed to evaluate Fraley's condition at the time of the hearing in 2007-23 on February 7, 2023, even though their decision noted that at the time he was doing a new job at Amazon, and here's what they basically said. Petitioner testified he's currently working at Amazon Air. He's stacking boxes, airport containers onto rollers so he can stack them. Petitioner testified while he's working at his new job, nothing has changed. He still has pain. Swelling is tolerable, and if he walks a long period of time, it swells more, gets sore. If it gets really bad, he elevates it, ices it, takes ibuprofen, gets swelling down. This does not happen often, but he walks on cement floors at work, and if he is walking on the steps, he has to take one step at a time with both feet. He testified he had started doing that probably three to six months ago before the hearing in 2023. When he walks down the stairs, he notices his left knee is hurting and clicking. He has to take one stair, stairs one at a time. So that condition didn't exist at the time of Arbitrator Herbace's hearing. It didn't exist in 2017. It existed while he was going through therapy, but it didn't exist on a day-to-day basis. What level of credibility did the commission give to his testimony in that regard? I don't know. That's what they cite in their decision. That's their decision. That's what they wrote in their decision. They noted this finding, but then again, I think they were so focused on 2017, they didn't realize they were supposed to be looking at how is he doing in 2023. Those are the comparison dates, Herbace and then 19-H hearing, but all their focus was on this 2017. They also said in their decision, Petitioner further testified to recreational activities he cannot do currently subsequent to the accident, and those, if you look at the transcript, he gave up roller skating, which he loved. He had to give up bike riding, and he also testified that in the job that he did, he had to give up driving a semi-truck because he could no longer use the left leg to press a clutch in. He couldn't press his clutch in in an automobile. Again, that didn't exist back in 2016 when Herbace heard the case, and it's affecting his job. It effectively caused him to give up recreational activities that he enjoyed. Imagine now for the rest of your life, you have to walk downstairs, not every time, but whenever it flares up, you've got to walk down a step, walk down a step, walk down a step. That's a significant impairment. I would hope I don't have to do that in the future. Again, all of these things, I think, show that their focus was on 2017. It wasn't on 2023, and therefore, they didn't use the proper standard. Clearly, this was caused either by, we haven't even talked about the 2018 accident, which again, an arbitrator heard and awarded an additional 12 and a half percent of a leg based upon his review of the evidence after that second injury when he stepped on the cable. Mr. Tewitt, the red light is on, but you will have time and reply. Okay, thank you. I think I've made my points, the main point that I wanted to make. Okay, thank you. Questions from the court for Mr. Tewitt at this point? Any questions? Okay. Mr. Zucke, am I correct? Yes. You may respond. Sure. Two points I'd like to make just at the beginning to directly address what Petitioner's Counsel indicated. The problem with his analysis is that there's a subsequent intervening accident. What they're trying to claim is that the commission looked at how the petitioner was doing at the end of 2017, the beginning of 2018, because the petitioner is claiming that there was also another, an additional increase in disability following the 2018 accident. If you rely on testimony after he was done treating in 2018, how do you assign the disability to the 19-H petition as opposed to the 2018 accident? So that is why they looked primarily at how the petitioner was doing at the end of 2017. Second of all, Counsel keeps suggesting that- So you're saying they're looking at that as a baseline for the second case? Correct. Okay, thank you. They have to, because it would be one thing if the petitioner wasn't claiming an increase in disability following the 2018 accident, then Petitioner's argument may have some color of merit. But when you have a subsequent intervening accident, which you claim is also increasing the degree of disability, what other time frame are you supposed to consider to determine if, in fact, there has been an increase in disability from the original injury? It would have to be before the second accident. Secondly, Counsel, I think, incorrectly is implying the Commission did find that there was an increase in disability. It just wasn't to the extent that he claims. The Commission found that, based on the testimony, based on Dr. Chudik's report, based on the medical records, that there wasn't an increase of 3% disability from what it had been following the first injury. Counsel hasn't provided any case law to this court to indicate that the findings that he is relying upon justify the 12.5% or what he was claiming, like a 65% loss of a leg. Really, what this case is boiling down to is that the petitioner is asking this court, basically, to play Monday morning quarterback and just cherry-pick the minute amount of that arguably might support his position while simultaneously ignoring the mountain of evidence that the Commission relied upon to support its decision. As this court is well aware, the standard of review is against the manifest weight of the evidence. The petitioner has to show that the Commission's decision was clearly erroneous. The Commission is tasked with the ability to weigh conflicting testimony, to assign the appropriate weight to all the different witnesses, and that's exactly what they did. They provided a 14-page report or decision with respect to the 19-H petition, and they went through step-by-step how they reached their decision, what evidence they found credible, and what evidence they did not find credible. The same is true with respect to the 2018 accident. They went through the analysis that's provided by the Illinois Workers' Compensation Act and described, again, what weight they relied upon, what weight they gave credibility to, and what weight they did not. They did exactly what they're tasked to do. In this particular case, counsel seems to be relying upon Dr. Chudik's report to justify an increase in disability, which, again, the Commission did find an increase in disability, not just to the extent that the petitioner is requesting. But counsel says that this opinion is unrebutted. First of all, the Continental case, which I cited, specifically states that the Commission does not have to blindly accept any report or any opinion by any physician. It's just one factor that the Commission must take into consideration, and the Commission indicated what they found more credible. Dr. Chudik was a retained expert. He's not a treating physician. There is no treating physician at any time from the date of the first accident in 2013 up until present that ever opined that the petitioner was at risk of needing a knee replacement, of developing degenerative changes, things of that nature. They indicated the problems they had with Dr. Chudik's report being that he cherry-picked all the medical records and didn't list medical records that would refute his ultimate opinion. Next, his opinions have just simply been refuted by reality. He made all these dire predictions in 2021 that the petitioner was going to need more treatment, need injections, physical therapy, none of which has happened. This is analogous to, for instance, a resident in Florida making a claim with his or her insurance company for the total destruction of their house following a hurricane that never occurred, but arguing to the insurance company, well, the expert said it was going to happen, so I'm entitled to receive compensation for the destruction of my house, based on that prediction alone. In this case, the last time the plaintiff saw a physician was Dr. Borchardt in July of 2018, but in May of 2018, Dr. Borchardt told the petitioner that it may be another six months for the bone bruise that was diagnosed by the MRI for it to heal. Therefore, there's a clear inference that there was a discussion about his prognosis. There's nothing in his records or any other treating physician's records that he was going to go on to this dire prognosis that Dr. Chudik claims that he found based on an examination in May of 2021. Lastly, and this is, I think, the biggest problem I have with Dr. Chudik's report and the commission, is the petitioner is trying to use Dr. Chudik's report based on an examination after both of these incidences and use it to justify an increase in disability for both cases. In other words, they're trying to claim that Dr. Chudik's report justifies an increase or a finding of a material increase in disability for the 19-H petition, and then turn around and use the same report and say, oh, by the way, also, it justifies an increase in disability for the 2018 accident. That's logically impossible that a single report based on a single examination after both of these incidents can justify an increase in disability for both cases, especially when, as the commission properly pointed out, that the report does not differentiate which accident may have been responsible for the current condition of ill-being. Next problem, or next problem the commission had with the plaintiff is simply they did not find the plaintiff's testimony particularly credible, and for very good reason. The petitioner testified in connection with the 19-H petition when he was asked and counsel pointed out how his condition was when he was discharged in the end of 2017 in comparison to when he testified under oath for the original arbitration hearing, and he said he was not any worse. Well, if you're not any worse, then why are you filing the 19-H petition? Second, in connection with the 2018 hearing, he was asked essentially the same question. How were you doing after you completed treatment in December of 2017? His quote was, one, he was doing great, and two, quote, you know, there was really no problem with it. Okay. Should we not believe him? If you're going to claim that you're great and there was really no problem with your knee, then why are you filing the 19-H petition? A reasonable person could conclude that what he's doing is he's trying to minimize his incident in 2017 to maximize his recovery in 2000 for arising out of his 2018 accident. Again, they chose to claim that both of these incidences increased disability. Had they only chose one or the other, then perhaps there would be more color of merit to the petitioner's argument, but they're basically trying to get a double recovery for the exact same evidence. Counsel indicates that, well, he said that he didn't remember about 13 times when he was being cross-examined. Well, the medical records that were generated beginning in October 2017 through the end of 2017 specifically state that he repeatedly said he was having no pain, no limitations, no problems whatsoever. Again, a comment from the petitioner that he doesn't remember, doesn't refute metaphors that were generated at or around the time that the plaintiff was seeking this type of  Next, the commission incorrectly pointed out he repeatedly indicated on numerous occasions through the end of 2017 that he was having no pain, yet when he testified under oath, he said, well, when I said no pain, no pain doesn't mean no pain. Well, if no pain doesn't mean no pain, what does it mean? When you start redefining normal, literal words in the English language, of course, the commission isn't going to find him particularly credible. Again, what the petitioner's attorneys essentially arguing in this case is, you know, my client deserves a finding of increased disability, but in doing so, please ignore all the contradictory statements that he made throughout both times he testified under oath about these injuries. Next, the court properly relied on the Gay case because the Gay case is almost identical factually to this case. In the Gay case, the petitioner actually underwent a knee replacement and, you know, now this has a prosthetic knee. The court found that based on the plaintiff's complaints and the objective findings, that there was no increase in disability despite undergoing a knee replacement. The problem we have in this case is the petitioner was asking for about 65 percent of a foot based on I don't know what. I mean, the person hasn't undergone a knee replacement. If he undergoes a knee replacement, then perhaps he would be entitled to file another 19H if it's within the time frame. But in this particular case, the plaintiff's actions do not match the testimony. The plaintiff testified at the hearing with respect to his current condition that he's in agony, that he has all these limitations. If so, then why haven't you gone back to the doctors that you also testified to? You were very satisfied with the type of treatment you received, and you were very satisfied with the results. Again, this is what the commission was brought to them, and they had obviously a lot of conflicting testimony that they had to consider. I understand that Petitioner's Counsel doesn't like the manner in which they resolve these conflicts, but it's not this court's job, or it wasn't the trial court's job, to play Monday morning quarterback and decide, well, you know what, had I heard this initially, I would have come to a different conclusion because that is not the task of this court. The court is simply trying to determine, was there a reasonable basis for the decision that the commission reached? And in this particular case, again, they went through step-by-step all the evidence they considered and why they came to the conclusions that they did. I understand that Petitioner's Counsel may have weighed the evidence differently. I mean, he's an advocate for his client. That would make sense. But it doesn't mean that the analysis by the commission was unreasonable. Every conclusion they reached is based on fact. I'm not suggesting that another set of eyes couldn't have come to a different conclusion. I mean, that's how the law is. Reasonable people can come to different conclusions looking at the same facts. That's not the issue. The issue is the conclusion that they reached. Was it completely unreasonable? Was it clearly erroneous? Was it against the manifest weight of the evidence? And based upon their analysis, it clearly was not. They simply placed greater weight on some testimony than the petitioner had hoped that they were able to convince them to. Again, in closing, I guess what I want to say is, again, and I think this is important, they didn't ignore Dr. Chudik's report. They just didn't give Dr. Chudik's report the same weight that Petitioner's Counsel would have. They found an increase in disability. This is not a situation where they denied the 19-H petition and they denied also the petition for claim, you know, application for adjustment claim arising out of the 2018 accident. Think of it this way, okay? Last thing I'll say is the 2018 accident, he had no surgery, he had no injections, he had no physical therapy, and he did not miss any time from work. If you were presented just with those facts, I'm certain no one would conclude that six months of treatment results in a 33% loss use of a leg. Because we got a credit for the 30% of the leg that he previously had. So clearly the Commission thought there was an increase in disability, and presumably it was at least based in part on Dr. Chudik's report. It just wasn't as high as Petitioner's Counsel had hoped. That doesn't mean that the decision by the Commission clearly erroneous and against the manifest way to the evidence. So therefore, if there's no questions, I thank you for your consideration and the appellee rest. Thank you, counsel. Questions from the court for counsel? No, okay. Thank you, counsel. Mr. Tewitt?  You may reply. How much time do I have, your honor? Five minutes. Five minutes, okay. I will be brief. Just addressing the first thing, the night talking about the 19-H petition as being done to do a double recovery. The 19-H petition was filed back, I think in 2016 when he started having more pain and needed the additional surgery that was done. It was not filed as part of some way to maximize benefits. In fact, the 2018 accident hadn't even occurred. We were worried about his condition back at that point in time. Again, counsel talks about all these doctor statements and this and that, and who is the expert here? Dr. Chudik. He's a board-certified orthopedic surgeon who performs these type of surgeries all the time. The last orthopedic opinion in this case, other than Dr. Chudik, was in 2017 when Dr. Whitehurst basically said, okay, let's see, where is it? I'm sorry. But basically he said, oh, it was on 10-30-97, doing well overall. His lateral retinaculum is tender. He has pain due to internal orthopedic prosthetic devices, continued PT, follow-up board chart, no lifting, climbing, ladder, or running, or jumping. That's the last orthopedic opinion in the case. All the other doctors were either occupational medicine doctors or nurse practitioners or that type of thing. They're not orthopedic surgeons. Dr. Chudik is an orthopedic surgeon. Dr. Whitehurst is an orthopedic surgeon. They have nothing to rebut. Even if you just said, well, it's given minimum weight, they have presented no orthopedic opinions regarding the condition. Why did we have two cases? Because he had another injury when he went back to work, unfortunately, which never had happened. But Dr. Chudik, in his report, clearly states that comparing his left knee condition during the previously at the 2016 trial, Mr. Fraley has obviously experienced an increase in permanent partial disability for his left leg. There have been changes in both the subjective symptoms and objective findings on x-rays since that time. And he says he will probably need additional treatment in a knee arthroplasty at some point in time. So again, that was the basis. That's why the two cases were together because they both contributed. We probably can't be absolutely sure which caused the problems that he was having when he was examined by Chudik. Was it originally from 2016? Was it originally or from this other injury? Unfortunately, they couldn't, like in arbitration cases, you could put those two cases together, they would resolve both of them together and issue one decision. But because it's on review, you can't do it that way. So they have to make a determination between the two. But again, the focus is how was he in 16? How was he in 2023? And we've already talked about this is the only evidence, Chudik's report is the only evidence of the condition of his knee at that time. And we have the testimony of the claimant that talks about, you know, what's happened to him. I used to drive the semi at work. I can't do that anymore because I can't push the clutch in with a knee more than twice. You testified you wore a brace on occasion. Give us a better description. Well, if it's bothering me a lot, I know I'm going to be doing a lot of walking on uneven ground, or even when I'm mowing, I have to wear my brace. And I asked him, did you have to do that before the 2018 incident? No. So his condition is definitely different. Mr. Tewitt, let me jump in. We're in the weeds because we need to be, but let's step back. And your argument on direct seemed to be that the commission rejected Dr. Tewitt's report. That's what you argued. Mr. Zwicky's argument was more that, you know, the commission has to judge the credibility and the evidence and just gave it a different weight. I'd like you to address that because now there seems to be some concession as to potentially the weight was part of the commission's analysis. Weight is, but the date is more important than the weight. The date is 23. That was in a 19 age. That hearing is the date that you judged the condition. Chudick, all I'm saying is it's the only report after 2017 from an orthopedic surgeon that discusses. And as, and again, that's what they focused on. It's like, they looked at it like it was his own case and we're going to look at how he was doing in 17 because he had the surgery then. And that's what's important. No, that's not what's important. What's important is how is he doing when he has his hearing on his 19 age hearing? The case law is clear that that's the date you look at. And the only evidence that's in the record is the petitioner's testimony, which they acknowledged in their decision, but they didn't deal with it. They didn't say the fact that he had to step down one step after another now in 2023, which he didn't have to do in 2016. Those are the two points. Can I ask a question? What is it that makes you say those are the only two points the commission should look at? Because that's how a 19 age works. It looks at... Is it in the statute? Is it from case law? Well, I would say it's from both. I mean, there are cases that say that those are... There was... I mean, you compare the evidence in the hearings, even in some of the cases Mr. Suzuki cited, you compare the evidence from the condition. Yeah, I can definitely see looking at the time of the hearing, but why not look at MMI, which was 2017? According to my reading of the record. Well, that's when he was released from care by... Well, then he had the second injury. So that's the complicating factor. Is there something that prevents the commission from just taking a look at the whole of it? No, I don't think so, Judge. But to you, it doesn't appear like they've done that here. Correct. Thank you. Because... Okay, your time has expired, Mr. Tewitt. Are there any further questions from the court? Okay, thank you. Well, thank you, counsel, both for your arguments in this matter this morning. We'll be taking them- Judge, can I just say one thing? What's up, Mr. Tewitt? I think this is probably my last appellate court argument of my career. So I've been honored to appear before all of you over the years. It's been a while since my last one, but thank you very much for your consideration here. Well, thank you, Mr. Tewitt, for years of service and advocacy before this court and in the commission and under the act. It's most appreciated and wishing you the very best in the future. Thank you, sir.